UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

United States of America,

    Plaintiff,

vs.          REPORT AND RECOMMENDATION

Silvino Arias Rodriguez,
a/k/a Silvino Rodriguez Arias,

    Defendant.    Crim. No. 05-354 (MJD/RLE)

* * * * * * * * * * * * * * * * * * *

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Defendant's Motion to Suppress Evidence.[1]   A Hearing on the Motion was conducted on February 13, 2006, at which time, the Defendant Silvino Arias Rodriguez ("Rodriguez") appeared personally, and by DeAundres D. Wilson, Esq., and the Government appeared by Tracy L. Perzel,

---

[1]The Defendant also filed a Motion for Leave to file the Suppression Motion. The Government does not oppose the Defendant's Motion, see, Government's Response to Defendant's Pretrial Motions, Docket No. 33, at p.2, and, finding cause for the Motion, we grant the same.

Assistant United States Attorney.  For reasons which follow, we recommend that the Motion be denied.[2]

## II. Factual Background

The Defendant is charged with one Count of unlawfully, knowingly, and intentionally possessing, with the intent to distribute,  in excess of five hundred (500) grams of cocaine, a controlled substance, in violation of Title 21 U.S.C. §§841(a)(1), and 841(b)(1)(B).  The offense is alleged to have occurred on or about October 4, 2005, in the State and District of Minnesota.  As pertinent to these charges, and to the Defendant's pending Motion, the operative facts may be briefly summarized.[3]

---

[2]At the close of the Hearing, all parties requested leave to submit post-Hearing memoranda on the legal issues presented by the Defendants' Motions.  Leave was granted, and the last brief was received on March 6, 2006, at which time, the Motion was taken under advisement.  See, Title 18 U.S.C. §3161(h) (1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 767-77 (8th Cir. 1995).

[3]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motion before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991), cert. denied, 505 U.S. 1228 (1992); United States v. Prieto-Villa, 910 F.2d 601, 610
(continued...)

At the Hearing, the Government presented testimony from Anthony R. Santos ("Santos"), who is a Special Agent for the Drug Enforcement Agency ("DEA"); Charles Strack ("Strack"), who is a Police Officer for the City of Little Falls, Minnesota, and who serves as an agent with the Central Minnesota Drug Task Force ("CMDTF"); and Michael Wochnick ("Wochnick"), who is also an agent with CMDTF.  In addition, the Defendant testified on his own behalf.

Santos testified that, on October 4, 2005, a confidential informant ("CI") placed a telephone call to the Defendant in order to arrange a meeting to purchase one half (½) pound of cocaine from the Defendant at a restaurant in Sauk Center, Minnesota, on October 5, 2005.  The CI also provided law enforcement with information which would assist in identifying the Defendant, together with a description of the Defendant's vehicle.

On October 5, 2005, law enforcement observed the Defendant, and his wife, in a vehicle, which matched the CI's description, at the arranged meeting time and place.  After the vehicle had parked, law enforcement officials approached the vehicle

---

[3](...continued)
(9th Cir. 1990).

with their firearms drawn, and the officials apprehended both the Defendant, and his wife, and separated them.

Santos, who testified that he is fluent in Spanish, and has conducted hundreds of interviews in Spanish, approached the Defendant.  Santos testified that he briefly spoke to the Defendant in Spanish, and advised him that he was under arrest, and he asked the Defendant whether he wanted to cooperate.  Santos stated that the Defendant affirmatively responded, and thereafter, he was handcuffed, placed in the front passenger seat of an unmarked van, and taken to the parking lot of a liquor store across the street.  Santos stood outside the passenger side door, and spoke to the Defendant through the open van window.

The Defendant was then interviewed, in Spanish, by Santos for approximately nine (9) minutes.  The interview was recorded, and a transcript, and a translation of the interview, has been provided by the Government.  Santos testified that the Defendant appeared to be of average intelligence, he answered appropriately Santos' questions, and he did not appear to be under the influence of alcohol or drugs.  Santos also stated that he did not employ any tactics, or threaten the Defendant with force, that he did not make any promises to the Defendant, and that he conducted the interview in a civil tone.

At the beginning of the recorded interview, the Defendant was read a <u>Miranda</u> warning in Spanish, see <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and the Defendant stated that he understood his rights, and that he was willing to answer some questions. Santos informed the Defendant that he had found dope in the Defendant's vehicle, and then, the following exchange occurred, which has been translated from Spanish:

> Santos:    We are here for a reason, right?  We didn't get here just by chance, okay?  Now you have the opportunity to cooperate and we will help you out too.  Okay?   So.
>
> Defendant:  How can you help me out?
>
> Santos:    Huh?
>
> Defendant:  How can you help me out?
>
> Santos:    We can, maybe we can give you more, less time.  Huh?  No [inaudible].
>
> Defendant:  Okay, okay, okay.  I will answer everything that I know.
>
> Santos:    We know that there is more dope.  That you have more dope.  Okay?  If you help us with that, if we find more dope, we help you out more.  Okay?
>
> Defendant:  I am only going to tell you everything that I have and that's it.

<u>Transcription and Translation of Recorded Statement</u>, at 2-3.

Santos then asked the Defendant about any cocaine that the Defendant had on his person, or at his residence.  The Defendant responded that he had a quantity of cocaine on his person, and one half (½) kilogram at his house.  The Defendant then also stated that he had "a question, I just don't want my children to see it."   In response, Santos asked the Defendant for his home address.

The Defendant asked the agents to loosen his handcuffs, and the agents complied, and they handcuffed the Defendant in front, rather than behind.  Santos then asked the Defendant about the cocaine he had at his residence.  The Defendant affirmed that he had the half (½) kilogram of cocaine at his home, and he provided his home address upon further questioning by Santos.  The Defendant further volunteered that he did not want to have his bosses find out that he had kept the cocaine in his residence.  Thereafter, the following discussion occurred:

> Santos:       Is the, is there someway to send somebody out there right now and get it?  Do you have any BC, BCA guys over there?

> Unidentified Voice:        [inaudible]

> Defendant:   I would like to go with you so that my children do not find out about that shit.

> Santos:       I don't know if we'll be able to, but we will do everything.  Where in your house is it?

\*       \*       \*

Defendant:   In a file cabinet, yes.

Santos:       In a, in a, in a file cabinet, like the ones where you keep your papers?  Do you have the key for that box?  Or, how are we going to get in there without a key?

Defendant:   Well, I need to go with you.

\*       \*       \*

Santos:       And who is at the house right now?

Defendant:   I think my children will be coming back from school soon.

\*       \*       \*

Defendant:   It makes me mad because I never get in these shit, you get in it one day and you blow up like an asshole.

Santos:       You know that we can, that there is a chance for you to do, you know with other people, and we can give you more [inaudible] also.  You already cooperated with us.

Defendant:   If you, if you and the whole bunch of officers go to my house and find something other than what I am telling you that I have, you can give me life in prison, honestly.  Huh?  Or if you find money there, if you find a bunch of money.  I wouldn't be here working my ass off with the cows!  Now, the only thing I ask you as a favor, my wife does not know anything about this shit.

Transcription and Translation of Recorded Statement, at 6-7, 10, 13-14.

- 7 -

Santos testified that he was not the officer in charge of the investigation, did not have the authority to reduce any of the charges filed against the Defendant, and only told the Defendant that they might be able "to do something for him."   Throughout the interview, the agents had their firearms secured in their holsters.

Santos testified that he and the Defendant, as well as Wochnick and Strack, traveled to the Defendant's residence at the conclusion of the interview, based on their belief that the Defendant had consented to a search of his house, the Defendant's desire to obtain the contraband before his children came home, and the Defendant's willingness to cooperate in providing his home address, and the location of the cocaine in his home.  Santos admitted that he had never expressly asked the Defendant for his consent to search his home, but that he had told Wochnick that the Defendant was willing to take the agents to his home.  Santos traveled in a separate vehicle, while the Defendant was transported with Wochnick and Strack.

During the approximately ten (10) mile drive to the residence, the Defendant initiated a conversation with Strack, in English, which was also recorded.   Strack testified that the Defendant sat in the front of the van, while Strack was seated in the middle seat of the van.  During the conversation, the Defendant asked Strack about his job, and discussed the Defendant's work on a dairy farm.  An unidentified officer

inquired about the Defendant's truck.   Strack then asked the Defendant about his

children, and whether they were either involved in, or knew of, the Defendant's

activities.  In response, the Defendant stated:

> No.  I talked to the officer.  I want to go to pick it up that
> fucking shit before my son and my daughter go to my home
> because I don't wanna my kids sick like that.

<u>Continued Statement of Silvino Arias Rodriguez</u>, at 3.

Later in the interview, the Defendant engaged Strack in the following conversation:

> Defendant:   I don't care if the government give [inaudible]
> jail to me so.
>
> Strack:         What's that?
>
> Defendant:   Don't care if the, if go to jail [inaudible].  I
> don't want.  I don't want problem for, for my wife.  My
> wife don't have nothing to do in this business.
>
> *       *       *
>
> Strack:         You know what Silvino, all I could say you
> know if you know anything, you want to stay your butt out
> of prison you know, you can * * * you know we, we can't
> promise you anything, but man you got kids to think about.
> You need to do what, what's right for you.
>
> Defendant:   Yeah.
>
> Strack:         What I'm saying, people are going to turn you
> in.  I guarantee you that much.  You know we got DEA
> guys here, that uh, have worked, they're in California and

they're just up here today.  You know, they can help you out if you're willing to do something.  I mean I know there's bigger people than you.

Defendant:   Yeah and you know, and you know what is the problem?  The, the, the problem, the little boys don't never see the, the high people.

Strack:        They never see them get taken down.

Defendant:   No.

Strack:        And, you know that.

Defendant:   Yep.

Defendant:   So what do you think?  Give me how, how, for how long do you think I stay in jail?

Strack:        What's that?

Defendant:   For how long do you think I stay in jail.

Strack:        You?

Defendant:   Yeah.

Strack:        Well, you're facing ah you're facing the federal system, you know.  I would say ten years.

*      *      *

Strack:        The problem is, is with this, this is a, this is a federal offense you know because you're over 50 grams. That makes it automatically federal system.  Okay? And like

> I said we can't promise you anything Silvino but if you're willing to help and you can help do good, you know depending on what you can do is what * * * you can help yourself out.  You know we've seen anywhere from no jail time to, to half off or what, it's whatever you can do for us. You understand that?
>
> Defendant:   Yeah.

<u>Id.</u> at 5-7.

Upon their arrival at the Defendant's residence, in Sauk Center, at approximately 5:30 o'clock p.m., Strack, Santos, and Wochnick, each testified that the Defendant's handcuffs were removed so as to comply with the Defendant's request not to have his children see him in restraints.

Strack and Santos also testified that they followed the Defendant into the home, were led to the Defendant's file cabinet in the master bedroom -- which he had pointed out -- and that the search of the bedroom took place in the presence of the Defendant. According to Santos, on the Defendant's bedroom was searched. Wochnick testified that the agents would have obtained a Search Warrant if it was necessary, but that the Defendant had given his implied consent.  The Defendant never voiced any desire for the agents to leave, or for the agents to refrain from searching the bedroom.  Strack and Santos further testified that they had not obtained a Warrant to search the Defendant's residence.  Upon discovery of the half (½) kilogram of cocaine, Social

Services was contacted to care for the Defendant's children.  The Defendant was then transported to the Stearns County Jail.  Santos also testified that he told the Defendant's daughter that she should not worry.

The Defendant testified on his own behalf, and stated that he was forty-two (42) years old and, in the course of testifying, he had difficulty spelling his name.  The Defendant stated that he was sitting in his truck, and was then commanded to step out of the truck at gunpoint.  He testified that he was asked his name by a law enforcement officer, was told to put his hands on top of the truck, and was then handcuffed, and had his wallet taken from him.  He further stated that, after he was handcuffed, Santos expressly asked him where the drugs were and what part of the truck contained the drugs, and that the Defendant needed to cooperate since they knew that he possessed more contraband.  The Defendant testified that Santos said "If you didn't give it to us, we will get it."  Based on those alleged statements by Santos, the Defendant testified that he agreed to cooperate.

The Defendant testified that he felt pressured, and scared for his children.  He also testified that Santos stated that cooperation would reduce his sentence by two (2) or three (3) years, but he could not state why he believed Santos, other than asserting that he "felt pressured" because of the conversation that had allegedly occurred before

the Defendant was placed in the van, and that Santos said "you're screwed."  He also testified that he could not recall being advised of his <u>Miranda</u> rights but, upon further questioning, he stated that "he did say rights at one point, but does not recall if it was in the van."

The Defendant testified that he only spoke to Santos in Spanish, during the initial interview, and that Santos did not translate everything that was said by other agents.  The Defendant testified that he had heard the earlier testimony of Santos, Wochnick, and Strack, and he stated that he cooperated because he felt pressured, and that he was never asked for his consent for the search.  The Defendant further testified that he acquiesced in giving the agents the directions to his house, and in allowing them to search his home, because "they would find it anyway."

He also testified that he was arrested nine (9) years ago for a DWI, and that, upon arrival at his home, the agents took pictures and searched his entire home.  He admitted that he opened the door to the house, and that the agents followed him inside. He stated that he felt he had no choice but to let the agents into his home, and again, that he felt pressured, that his daughter was frightened by the agents, and by the firearms that they were carrying in their holsters, and that she started to cry.

- 13 -

On cross-examination, the Defendant stated that he had accompanied his wife to the store so she could shop, and that he was planning on waiting to deliver the drugs to the prospective purchaser. He stated that he felt pressured before he was put in the van, but that he could not remember if he was given the Miranda warning, or if he told the agents that he was willing to cooperate. The Defendant testified that Santos behaved in a business-like manner, and was polite, in his interactions with him, and that Santos did not threaten any physical force. He further testified that he had not been under the influence of drugs, nor was he threatened in any manner, including in his interactions with agents that were not recorded on tape.

### III.  Discussion

A.      The Defendant's Motion to Suppress Statements.

1.      Standard of Review. Government agents are not required to administer Miranda warnings to everyone whom they question. See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977). Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'" Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420, 428-29 (1984).

- 14 -

Whether or not <u>Miranda</u> is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination.   See, <u>Dickerson v. United States</u>, 530 U.S. 428, 433-34 (2000).   For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." <u>Dickerson v. United States</u>, supra at 434, citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973).

As the Supreme Court has explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.]  See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant").  The determination "depend[s] upon a weighing of the circumstances of pressure against

the power of resistance of the person confessing." Stein v.
New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and

foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507

U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly,

479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee,

322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367

U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v.

Denno, 347 U.S. 556, 561 (1954).  See also, Withrow v. Williams, supra at 693 (listing

the applicable considerations).

2.    Legal Analysis.   Here, there is no dispute that the Defendant was in

custody at the time that his statements were made to law enforcement, and that he

made those statements during a custodial interrogation.   The Defendant does not

appear to challenge the validity of his arrest which, in any event, was supported by

probable cause, since it occurred in connection with the arranged controlled buy.

The testimony of Santos, as well as the audio recording, transcript, and

translation of the statement that the Defendant provided to law enforcement, disclose

that Santos fully apprised the Defendant of each of his rights under Miranda v.

- 16 -

Arizona, supra, and that the Defendant agreed to answer the agents' questions. See, Transcription and Translation of Recorded Statement. Accordingly, since there is nothing in the Record to suggest that any of the agents employed coercive tactics, in securing that waiver, we find that the Defendant knowingly, intelligently, and voluntarily, waived his Miranda rights.

At the outset, we consider the Defendant's testimony that he was questioned, before receiving a Miranda advisory, by Santos. Specifically, the Defendant testified that he felt pressured because of an alleged five (5) minute conversation that, he maintains, transpired between himself, and Santos, before the provision of a Miranda warning. Santos, as well as the other agents, deny that any such conversation occurred, and Santos testified, we find credibly, that any pre-Miranda exchange was limited to informing the Defendant that he was under arrest, and asking him if he was willing to cooperate. Notably, the Defendant does not rely on the contents of any such alleged conversation in his Memorandum of Law, so as to support a contention that his statements were involuntary. Nevertheless, we accord greater believability to the testimony of Santos, and Wochnick, that no such pre-Miranda exchange occurred because, on this point, the Defendant's testimony was undermined by his inability to recall the substance of any Miranda warning, at any time, notwithstanding the fact that

such an advisory was tape recorded.  The Defendant's recall vague at best, and we also find implausible his contention that he felt pressured, by the officers, to provide inculpatory statements, and consent to search his residence.  In point of fact, if the Defendant felt pressure, it was generated by his legitimate concern that his children might uncover the cocaine that he had stashed in his bedroom, or that his wife might be implicated in the drug dealing.  These were not concerns generated by any questioning from law enforcement.  Accordingly, we find no violation of <u>Miranda</u> on this basis.

Next, the Defendant argues that he did not validly waive his <u>Miranda</u> rights, and that his resulting statement was involuntary, as the product of police "pressure."[4]  The Defendant contends that the agents' statements, that the Defendant's cooperation would be looked upon favorably, and that Santos would arrange to have the Defendant receive less jail time, were so coercive as to render any statement, involuntary,

---

[4]The Government contends that the Defendant has waived any consideration of whether his statement was voluntary, since that issue was not specifically raised, in his pre-Hearing filings, by a timely Motion.  See, Rule 12(e), <u>Federal Rules of Criminal Procedure</u>.  The Government further argues that the Defendant agreed that the single issue at the Hearing was whether the Government had a legitimate basis for searching the Defendant's residence.  See, <u>Government's Memorandum in Opposition to Pretrial Motion</u>, <u>Docket No. 37</u>, at 6.  However, we find cause to consider the voluntariness issue, and decline, on this Record, to conclude that the issue was waived.

unknowing, and unintelligent. Here, under the "totality of the circumstances," we find

that the Defendant's statement was voluntarily given.  "[C]ases in which a defendant

can make a colorable argument that a self-incriminating statement was 'compelled'

despite the fact that the law enforcement authorities adhered to the dictates of <u>Miranda</u>

are rare." <u>United States v. Astello</u>, 241 F.3d 965, 966 (8th Cir. 2001), cert. denied, 533

U.S. 962 (2001), quoting <u>Berkemer v. McCarty</u>, supra at 433; see, <u>United States v.</u>

<u>Pierce</u>, 152 F.3d 808, 813 (8th Cir. 1998).

As our Court of appeals has recognized:

> To state the obvious, "interrogation of a suspect will
> involve some pressure because its purpose is to elicit a
> confession." [United States v. Astello, supra at 967].
> "[T]he fact that the tactics produced the intended result *
> * * does not make a confession involuntary." Id. at 968.
> In other words, 'there is nothing inherently wrong with
> efforts to create a favorable climate for confession." United
> States v. LeBrun, 306 F.3d 545, 555 (8th Cir. 2002)(internal
> citations omitted.  "'[Q]uestioning tactics such as a raised
> voice, deception, or a sympathetic attitude will not render
> a confession involuntary unless the overall impact of the
> interrogation caused the defendant's will to be overborne.'"
> Astello, 241 F.3d at 967 (quoting Jenner v. Smith, 982 F.2d
> 329, 334 (8th Cir. 1993)).  Nor will a promise of leniency, an
> "expressed disbelief in the statements of a suspect * * *, or
> lie[s] to the accused about the evidence against him"
> necessarily render a confession involuntary.  Wilson v.
> Lawrence County, 260 F.3d 946, 953 (8th Cir. 2001)
> (internal citations omitted).  Rather, the coercive conduct

> must be "such that the defendant's will was overborne and
> his capacity for self determination critically impaired."
> Astello, 241 F.3d at 967 (internal citations omitted).

United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002); see, United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005); United States v. LeBrun, 363 F.3d 715, 725-26 (8th Cir. 2004), cert. denied, 543U.S. 1145 (2005); see also, United States v. Martin, 369 F.3d 1046, 1052-53, 1056 (8th Cir. 2004).

There is nothing in the Record to suggest that the Defendant's waiver of his rights was involuntary, or that his will was overborne. The Defendant testified that he was not under the influence of alcohol or controlled substances, and Santos testified that the Defendant gave lucid and responsive answers to Santos' questions, and that he did not give any indication of below-average intelligence. The transcript of the interview confirms Santos' testimony, and further demonstrates that no threats were made to the Defendant. The Record convinces us that the Defendant was properly advised of his Miranda rights, he understood those advisories, and he voluntarily, and knowingly, elected to respond to official questioning. We further find no evidence that his statements to law enforcement were secured by threats, or unlawful promises.

The exchange between Santos and the Defendant began with a reading of a Miranda warning in Spanish, which was presumably the Defendant's primary

language.[5]   The period of questioning lasted for approximately nine (9) minutes, and there was no intimation, by the Defendant, that physical force was threatened, however slightly.   In fact, Santos testified that, when the Defendant complained that his handcuffs were too tight, the agents repositioned the handcuffs to make the Defendant more comfortable, and the Defendant recalled those events.   Furthermore, the Defendant had some prior experience with law enforcement arising from his previous DWI arrest.

Moreover, Santos was vague in specifying what, if any, help he could provide to the Defendant as to his potential sentence.   Indeed, given the full Record, we find that Santos' statements did not overcome the Defendant's will, and therefore, that his statements were freely given.   Specifically, the Defendant asked Santos what he had meant when he stated "we will help you out."   In response, Santos replied, "Maybe we can give you more, less time."   The Defendant now casts that statement as a promise, which was intended to lead him to believe that Santos possessed the authority to reduce the Defendant's jail time.

---

[5]We note that, at the Hearing, the Defendant was assisted by an interpreter, and that he testified in Spanish.  However, his colloquy with Strack reveals an ability, on the Defendant's part, to meaningfully communicate in English.

However, as our Court of Appeals has recognized, "[e]ven assuming that a reasonable person would view the Agents' statements as a promise, a promise made by law enforcement 'does not render a confession involuntary per se." United States v. LeBrun, supra at 725, quoting Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001), cert. denied, 534 U.S. 924 (2001). Moreover, "it is not enough to show that the authorities' representations were the but-for cause of a confession." Id., citing Schneckloth v. Bustamonte, supra at 224. Under the law of this Circuit, advising a suspect of the benefits of cooperation, without more, does not "transform an otherwise voluntary statement into an involuntary one." United States v. Mendoza, 85 F.3d 1347, 1350 (8th Cir. 1996)(interrogator's promise to make suspect's cooperation known to prosecutors was not coercive), citing United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995)(same); United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990)(interrogator's threats of long prison sentence, absent cooperation, did not render subsequent statement, by suspect, involuntary), cert. denied, 502 U.S. 829 (1991). Indeed, even a promise of non-prosecution, in and of itself, will not render a statement involuntary. United States v. Larry, 126 F.3d 1077, 1079 (8th Cir. 1997), citing United States v. Kilgore, supra, and Tippitt v. Lockhart, 859 F.2d 595, 597 (8th Cir. 1988), cert. denied, 490 U.S. 1100 (1988).

- 22 -

Here, Santos did not make an unequivocal promise of assistance in a reduction of jail time, but instead, prompted by the Defendant's request for clarification, he stated that "maybe" he could aid the Defendant in receiving more or less jail time. Furthermore, the Defendant did not evince any showing that the amount of potential jail time was a factor in his cooperation, as he stated, as follows, in his conversation with Strack:

> Defendant:   I don't care if the government give [inaudible] jail to me so.
>
> Strack:       What's that?
>
> Defendant:   Don't care if the, if go to jail [inaudible].   I don't want.   I don't want problem for, for my wife.   My wife don't have nothing to do in this business.

Given the Defendant's statements, which reveal an apparent lack of concern over the time he spent in jail, so long as his wife was not implicated, any contention, now, that Santos' encouragement of cooperation improperly induced the Defendant to talk, is substantially undercut.   Furthermore, more definite promises have not been held to impermissibly render a defendant's waiver of his <u>Miranda</u> rights involuntary.   See, <u>United States v. Astello</u>, supra at 967-68 (agents' failure to allow defendant to see his mother, and their representation to defendant that the train was leaving the station and

that those who told the truth would be on the train, while those left behind would be charged with a crime, as well as implication that the defendant would receive a more lenient sentence if he confessed, did not render the defendant's subsequent statement involuntary).

Given the totality of the circumstances, we find and conclude that the Defendant's statement was voluntarily given, and we recommend that his Motion to Suppress any Statements be denied.

B.    The Defendant's Motion to Suppress the Evidence Obtained From the Search of the Defendant's Home.

1.    Standard of Review. The Fourth Amendment to the United States Constitution "generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." Illinois v. Rodriguez, 497 U.S. 177, 180 (1990), citing Payton v. New York, 445 U.S. 573 (1980); Johnson v. United States, 333 U.S. 10 (1948). However, "'[a]n officer with consent needs neither a warrant nor probable cause to conduct a constitutional search.'" United States v. Pennington, 287 F.3d 739, 746 (8th Cir. 2002), cert. denied 537 U.S. 1022 (2002), quoting United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996), cert. denied, 420 U.S. 1170 (1997), citing Schneckloth v. Bustamonte, supra at 218. "Whether or not

- 24 -

the consent was voluntary must be established by examining the totality of the circumstances, including "'both the characteristics of the accused and the details of the interrogation.'"   United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000), quoting United States v. Chaidez, 906 F.2d 377, 380-81 (8th Cir. 1990), quoting, in turn, Schneckoth v. Bustamonte, supra at 226.   "We consider the following characteristics of the individual to determine whether their [sic] consent was truly voluntary: age, intelligence, intoxication, advice of Miranda rights, and previous arrests." United States v. Reinholz, 245 F.3d 765, 780 (8th Cir. 2001), citing United States v. Chaidez, supra at 381; see also, United States v. Urbina, 431 F.3d 305, 309 (8th Cir. 2005); United States v. Alcantar, 271 F.3d 731, 737 (8th Cir. 2001), cert. denied, 535 U.S. 964 (2002).

In addition to the characteristics of the defendant, "[w]e also consider the following characteristics of the environment in which the individual's consent was given, so as to determine whether their [sic] consent was truly voluntary:  length of detention, threats and misrepresentations by police, whether the individual is in custody or under arrest, whether it is a public or private place, and the suspect's contemporaneous objections and representations." United States v. Reinholz, supra at 780; see also, United States v. Va Lerie, 424 F.3d 694, 709 (8th Cir. 2005)[en banc],

pet. for cert. filed (U.S., February 16, 2006); <u>United States v. Mendoza-Cepeda</u>, 250

F.3d 626, 629 (8th Cir. 2001)(listing factors to be considered as to voluntariness of

consent to search).   Ultimately, "[c]onsent is voluntary if it was '"the product of an

essentially free and unconstrained choice by its maker,"' * * * rather than 'the product

of duress or coercion, express or implied.'"   <u>United States v. Bradley</u>, supra at 366,

quoting <u>United States v. Chaidez</u>, supra at 380, quoting, in turn, <u>Schneckloth v.

Bustamonte</u>, supra at 225, 227.   "[T]he question of whether a consent to search was

in fact 'voluntary' or was the product of duress or coercion, expressed or implied, is

a question of fact to be determined from the totality of all circumstances."

<u>Schneckloth v. Bustamonte</u>, supra at 227; see also, <u>United States v. Fleck</u>, 413 F.3d

883, 891-92 (8th Cir. 2005).   The Government has the burden to show, by a

preponderance of the evidence, that a defendant's consent was voluntary.  See, <u>United

States v. Esquivias</u>, 416 F.3d 696, 700 (8th Cir. 2005), citing <u>United States v. Cedano-

Medina</u>, 366 F.3d 682, 684-85 (8th Cir. 2004); <u>United States v. White</u>, 81 F.3d 775,

780 (8th Cir. 1996).

   2.   <u>Legal Analysis</u>.     Here, it is undisputed that law enforcement did not

secure a Search Warrant, nor did they obtain the Defendant's express consent, either

oral or written, to search his home.  Rather, the agents contend that they obtained the

Defendant's implied consent, as a result of his actions, and other statements.  The Defendant, in turn, argues that no such consent was given, and that, if such consent was inferred, it was involuntarily provided as the result of coercion.  We turn to consider whether the Defendant gave such consent, and whether that consent was voluntarily given.

In determining whether an individual has expressed consent, "[t]he precise question is not whether [the accused] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he had consented." United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001).  "Consent can be inferred from words, gestures, and other conduct." Id., citing United States v. Mendoza-Cepeda, 250 F.3d 626, 627 (8th Cir. 2001).

Here, the Defendant acted in a manner which, objectively, would have provided a proper basis upon which law enforcement could reasonably infer that consent to search the Defendant's residence had been freely given.  Santos initially asked the Defendant if he had any cocaine at his house, and additionally, he asked for the Defendant's address.  The Defendant confirmed that he had one half (½) kilogram of cocaine at his house, and he provided his home address.  The Defendant then stated that he did not want his children to discover the cocaine.  Afterwards, Santos asked

his accompanying law enforcement agents whether they could have some "BC" or "BCA" agents proceed over to the Defendant's residence to secure the cocaine, to which the Defendant immediately offered:  "I would like to go with you so that my children do not find out about that shit."  The Defendant then identified the location of the cocaine as being within a file cabinet in his bedroom, and he stated that he would "need to go with you."  He also explained that he "thought [his] children [would] be coming back from school soon."  The Defendant related that, if the law enforcement officials went to his house and found something inconsistent with what the Defendant had stated, then "you can give me life in prison."

Further, the Defendant's actions were consistent with the provision of consent, as he told Strack:  "I want to go to pick it up that fucking shit before my son and my daughter go to my home because I don't wanna my kids sick like that."  Furthermore, the Defendant never evinced any objection to law enforcement entering his home, as he led them into his house, and took them directly to the location of the stored cocaine.  Here, the Defendant is a mature individual, who does not suggest that he was under the influence of any intoxicant, at the time that consent was given, nor can he claim that any difficulty, which he may have in speaking English, hindered his ability to intelligibly speak with Santos, as that conversation was conducted in Spanish.

We are mindful that Santos did not inform the Defendant that he did not have to consent to the search, but the consent followed a <u>Miranda</u> advisory, and our Court of Appeals has held that the absence of such an advisory is not determinative of the issue of voluntariness.   See, e.g., <u>United States v. Va Lerie</u>, supra at 710 ("The Supreme 'Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search.'"), quoting <u>United States v. Drayton</u>, 536 U.S. 194, 206 (2002); <u>United States v. Esquivias</u>, supra at 701 ("While the officers did not inform [the defendant] of his right to refuse consent, a defendant need not be aware, nor must an officer inform him, of his right to refuse consent for his consent to be voluntary."), citing <u>United States v. Becker</u>, 333 F.3d 858, 861 (8th Cir. 2003); <u>United States v. Alcantar</u>, supra at 737 ("Although [the defendant] was not advised of his right to refuse consent, that was not in and of itself sufficient to find that consent was not voluntarily given."), citing <u>United States v. Zapata</u>, 180 F.3d 1237, 1242 (11th Cir. 1999).

Moreover, the context in which the consent was given supports our finding that the search of the Defendant's residence was consensual, and voluntary.   The questioning of the Defendant, by Santos, was brief -- lasting only about nine (9)

minutes in duration.  The Defendant was not threatened, physically intimidated, or punished by the police and, while he was encouraged by Santos to cooperate, and was advised that such cooperation might impact upon his potential sentence, he was not given specific promises which could have been fairly interpreted as definite or enforceable.  Indeed, the Defendant conceded that Santos treated him in a business-like, and polite manner.  See, e.g., <u>United States v. Urbina</u>, supra at 309 ("There is no evidence that the officer treated [the defendant] in anything other than a professional manner."); <u>United States v. Thompson</u>, 408 F.3d 994, 996 (8th Cir. 2005)("[T]he police treated [the defendant] in a polite and friendly manner.").

Although the Defendant was in custody, and under arrest, at the time that the consent was given, "[t]he custodial status of the consenting party is not determinative [of voluntariness]."  <u>United States v. Fleck</u>, supra at 892, quoting <u>United States v. Czeck</u>, 105 F.3d 1235, 1239 (8th Cir. 1997).  Further, at the time of the questioning by Santos, the Defendant was in a public place.  See, <u>United States v. Urbina</u>, supra at 309 ("The interior of a police patrol car on the shoulder of a public highway during the day is not a secluded location."), citing <u>United States v. Chaidez</u>, supra at 382, and

- 30 -

United States v. Mancias, 350 F.3d 800, 806 (8th Cir. 2003).[6]  Moreover, there is no

evidence that the Defendant ever objected to the presence of the officers on his

property -- rather, he participated in the search, and freely cooperated with the

officers.

The Defendant, however, contends that any appearance of consent on his part

was a "mere acquiescence to the authority of the agents."  Memorandum in Support

of Motion to Suppress Evidence,  at  7.  We disagree.  At no time did the Defendant

object to the search of his home; rather, he facilitated the search at every juncture.  He

expressed his interest in proceeding to his home with the officers, and he expressed

an overarching concern that the cocaine should be removed from his home before his

children could be exposed to it.  He opened the door to his home, and allowed the

---

[6]We do not overlook that, when the Defendant first encountered the arresting officers, they had weapons drawn.  Thereafter, while the officers remained armed, there is no suggestion that they were brandishing weapons.  As our Court of Appeals has observed, "we are not persuaded that two or three officers being armed with holstered firearms in a private room inside a bus terminal negates [the defendant's] consent."  United States v. Va Lerie, 424 F.3d 694, 710 (8th Cir. 2005), citing United States v. Drayton, 536 U.S. 194, 205 (2002)("That most law enforcement officers are armed is a fact well known to the public," and "[t]he presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.").  Accordingly, we conclude that the presence of holstered firearms, on the investigating officers, did not render the Defendant's consent involuntary.

officers to follow him inside, without the slightest protestation.  He led the officers to his bedroom, where the drugs were seized -- again, without protest from the Defendant -- and he pointed out the file cabinet in which the drugs were hidden.

Under similar circumstances, the Courts have found such facilitation in the conduct of a search to be consistent with consent.  See, e.g., United States v. Fleck, supra at 892 ("[The defendant's] production of the bedroom key constituted further indicia of consent to search the bedroom."); United States v. Thompson, supra at 995-96 (The defendant's actions during the traffic stop, by retrieving the keys to his locked trunk, and opening the trunk, and by opening the door to his car when the officer asked if he could search the vehicle, "suggest that he voluntarily consented."); United States v. Williams, supra at 799 ("Further, consent reasonably implied from behavior suffices to trigger the exception [to the Warrant requirement];" and Court finds that resident holding door to apartment wide open and stepping aside was evidence of consent.); United States v. Mendoza-Cepeda, supra at 627-29 (defendant's gestures in handing bag to officer in response to officer's request to search bag; lifting boots in response to officer's request to search boots; and lifting arms in response to officer's request to search torso; were reflective of voluntary consent); United States v. Jones, supra at 695 (defendant's holding "arms out away from his body about ten

to eighteen inches from his midsection, with his palms turned out," found to evidence consent to search torso); United States v. Pollington, 98 F.3d 341, 343 (8th Cir. 1996) ("Of special significance, we note that [the defendant] offered to open the motor home's back door to facilitate [the trooper's] search."); United States v. Gleason, 25 F.3d 605, 607 (8th Cir. 1994), cert. denied, 513 U.S. 911 (1994)("The district court properly inferred [the defendant's] consent from his testimony that facilitated the trooper's search of a cardboard box located in the trunk" and, "[i]n addition to [the defendant's] assistance during the search, the district court noted that [the defendant's] general demeanor suggested consent; he chatted with [the trooper], reminded the trooper of his work as a police officer, and acted friendly, not hostile.").

Here, the Record is bereft of any command, let alone any direction to the Defendant, by law enforcement, to subject his home, or its contents, to a search. The exchange between the Defendant, and both Santos, and later Strack, appears to have been unemotional, and without threat or duress. Given this Record, viewed in the totality of the circumstances, we find that the officers reasonably believed that the Defendant had consented to the search of his home, and we further find that the consent was voluntarily given. While the Defendant appears to suggest that the scope of the search exceeded the consent given, we have no showing that any evidence was

- 33 -

seized, other than the cocaine found, with the Defendant's assistance, in his bedroom. Even if we credited the Defendant's testimony that the whole house was searched, which we do not given the believable testimony of Santos, that only the bedroom was searched, "[w]e measure the scope of consent under the Fourth Amendment using a standard of objective reasonableness, considering what an objectively reasonable person would have understood the consent to include." United States v. Urbina, supra at 310, citing United States v. Fleck, supra at 892. In the absence of any contemporaneous objection, by the Defendant, to a search of his residence -- inclusive of his bedroom, and the routes necessarily followed to and from that bedroom, or anywhere else for that matter -- we find no impermissible extension of the scope of the search.

In sum, we find nothing in the Record which would support that the consent inferred by the Defendant's behavior was coercively gained, or that the Defendant acted in a manner that was involuntary. As a consequence, we recommend that the Defendant's Motion to Suppress Evidence be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Defendant's Motion for Leave to File Suppression Motion [Docket No. 25] be granted.

2.     That the Defendant's Motion to Suppress Evidence [Docket No. 29] be denied.


Dated:  March 15, 2006                      s/Raymond  L. Erickson

                                            Raymond L. Erickson
                                            CHIEF U.S. MAGISTRATE JUDGE


**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than March 31, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than March 31, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.